IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOELAUNDA CASTILLANOS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-22-1442 |
| | § | |
| NAHUEL FAIURA, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

On Memorial Day 2020, Houston police officers responded to a 911 call placed by Joelaunda Castillanos, reporting that her husband, Joe Castillanos, a Marine Corps veteran suffering from post-traumatic stress disorder, was experiencing a mental health crisis and threatening to commit suicide with a pistol he was holding to his head. (Docket Entry No. 1 ¶ 10). The officers' encounter with Joe Castillanos escalated and ended tragically when the officers shot and killed him. This lawsuit followed.

Joelaunda Castillanos, suing for herself and on behalf of her children, alleges that the responding officers did little to calm her husband and instead shot him—in front of her and their children—within minutes of arriving at the scene. (*Id.* ¶¶ 16–18). Mrs. Castillanos sued the Houston Police Department and the City of Houston for failing to train their officers to respond appropriately to citizens in distress under 18 U.S.C. § 1983. She alleges violations of her husband's rights under the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution. She also sued the police officers that responded to the 911 call (Nahuel Faiura, Todd Henson, Michael Macuga, and two other unnamed police officers) for using excessive force that violated Castillanos's federal constitutional rights and for intentionally inflicting emotional distress. The individual defendants move to dismiss the complaint for failure to state a claim and for failure to

allege facts that could overcome qualified immunity. The Houston Police Department moves to dismiss because it is not an entity that can be sued, and the City of Houston moves to dismiss for failure to state a claim for municipal liability.

After considering the pleadings, the motions and responses, the applicable authorities, and the body-worn camera footage submitted by the defendants, (Docket Entry Nos. 11–15, 17), the court grants the motions to dismiss. The following claims are dismissed with prejudice: the Fourth, Eighth, and Fourteenth Amendment claims against the individual officer defendants; the failure-to-train claims against the City of Houston; all claims against the Houston Police Department; and the state-law claims against all defendants. Mrs. Castillanos's claims about the officers' failure to render aid to Mr. Castillanos after the shooting are dismissed without prejudice, with leave to amend no later than November 7, 2022.

I.      **The Legal Standard for a Motion to Dismiss**

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted lawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556).

To withstand a Rule 12(b)(6) motion, a complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Lincoln v. Turner*, 874 F.3d 833, 839 (5th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555). A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

While a court should "freely give leave [to amend] when justice so requires," FED. R. CIV. P. 15(a)(2), futility of amendment is a proper basis to deny that leave. *Butler v. Porter*, 999 F.3d 287, 298 (5th Cir. 2021); *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## II.     The Claims Against the Houston Police Department

Mrs. Castillanos concedes that the Houston Police Department is not a proper party to this lawsuit. (Docket Entry No. 14 at 3). Her claims against the Department are dismissed with prejudice because it is not an entity that can be sued. *McAfee v. Hous. Police Dep't*, No. 4:19-cv-112, 2019 WL 12021829, at *1 (S.D. Tex. Mar. 19, 2019) ("[T]he Houston Police Department is a subdivision of the City of Houston and therefore does not have a separate legal identity that would allow it to sue and be sued.") (collecting cases).

### III. The Claims Against the Individual Officers

#### A. The Fourth Amendment Claims

Mrs. Castillanos alleges that the actions of the responding officers violated Joe Castillanos's right to be free of excessive force. (Docket Entry No. 1 ¶¶ 17–25). A plaintiff claiming excessive force must allege facts that could show "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). "An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021) (alteration omitted) (quoting *Manis*, 585 F.3d at 843).

Mrs. Castillanos alleges that, when she called 911, her husband was walking on the sidewalk near their family home, holding a pistol to his head. (Docket Entry No. 1 ¶ 10). She alleges that when the officers responding to her 911 call arrived at the family's home, they "immediately began to shout and scream at Mr. Castillanos, using profanities with their guns drawn." (*Id.* ¶ 12). She alleges that when Mr. Castillanos "saw the officers," he "immediately turned his back from the officers and slowly started walking away from the officers towards his house." (*Id.*). Mrs. Castillanos alleges that "[Mr. Castillanos] did not engage [the officers] in spite of their barrage of shouts and [expletives] and attempts to incite him to anger." (*Id.*). As Mr. Castillanos walked away from the officers, he "kept [his] gun at his side pointed toward the ground." (*Id.* ¶ 13). Mrs. Castillanos alleges that the officers then "charged" at Mr. Castillanos, who was calm and not running. (*Id.*). She alleges that the officers "goaded him into raising his weapon after having discharged their own and after having chased him while already in a dazed stupor." (*Id.* ¶ 15).

4

The officers respond to the excessive force claim by arguing that there was no constitutional violation because the force they used was objectively reasonable under the circumstances presented—a man in a mental health crisis, armed, repeatedly refusing the officers' orders, and turning while raising the gun in the officers' direction. They rely on the footage from Officer Macuga's body-worn camera. (Docket Entry No. 11 at 21–22; Docket Entry No. 11-1). The officers contend that the video footage shows that they did not fire their weapons until after Joe Castillanos had "actually raised his handgun [and] aimed it in the direction of responding officers." (Docket Entry No. 11 at 23).

A court may "consider documents [or other materials] attached to the Rule 12(b)(6) motion that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Allen v. Hays*, 812 F. App'x. 185, 189 (5th Cir. 2020) (emphasis omitted) (quoting reference omitted). When the material in question is video footage of the event at issue, the district court "should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe [the plaintiff's] account." *Darden v. City of Fort Worth*, 880 F.3d 722, 730 (5th Cir. 2018); *see also Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013) (citing *Scott v. Harris*, 550 U.S. 372, 374–76, 378–81 (2007)). A court may discount the complaint allegations in favor of video footage only when it "blatantly contradict[s]" the plaintiff's well-pleaded factual allegations. *Ramirez*, 716 F.3d at 375; *Griffin v. City of Sugar Land*, No. 4:18-cv-3121, 2019 WL 175098, *6 (S.D. Tex. Jan. 11, 2019) (adopting the video depiction over the complaint allegations when the video showed the plaintiff violating a city ordinance, clearly contradicting his complaint allegation that the arresting officers lacked probable cause to arrest him), *aff'd*, 787 F. App'x 244 (5th Cir. 2019) (per curiam).

Mrs. Castillanos refers to the video in her complaint, it is attached to the motion to dismiss, and it is central to the allegations in the complaint. For example, she alleges that the "video shows Castillanos was still calm and not running" when the police officers charged toward him and shot him. (Docket Entry No. 1 ¶ 13). She does not dispute the authenticity of the video footage in her brief responding to the motion to dismiss. (Docket Entry No. 14 at 9) (describing the contents of part of the video submitted by the defendants). The court finds it appropriate to consider the video footage because there is no dispute as to its authenticity, because it shows the actions taken by the responding officers on which Mrs. Castillanos bases her excessive force claims, and because it shows the actions by Mr. Castillanos that the officers assert entitle them to dismissal and to qualified immunity.

The video footage shot from Officer Macuga's body-worn camera, (Docket Entry No. 11-1), begins with Officer Macuga driving to the scene. When Officer Macuga arrives and gets out of his car, Mr. Castillanos is backing away from the other responding officers. Mr. Castillanos then turns around and continues to walk away from the officers, holding his gun. The video shows Mr. Castillanos holding the gun in his right hand, at his side, pointing toward the ground. The officers shout at Mr. Castillanos to stop and drop his gun. Mr. Castillanos continues walking down the sidewalk, away from the officers, with his gun at his side. He walks past Officer Macuga's police vehicle, and Officer Macuga moves in front of his vehicle, keeping Mr. Castillanos in the camera's view. As Officer Macuga moves, another officer becomes visible walking on the lawn of a neighboring home, moving at approximately the same speed as Mr. Castillanos. When that officer leaves the camera view, he is behind and to the left of Mr. Castillanos. At approximately six-and-a-half minutes into the video, a noise resembling a gunshot can be heard, but it is not

apparent whether Mr. Castillanos fired his pistol, and the officers do not audibly or visibly react to the noise.

Mr. Castillanos reaches a point on the sidewalk where there is a tree on his right. At that point, he raises his right arm slightly and begins to turn left to face the officers. The gun is briefly obscured from the video camera by Mr. Castillanos's body, but the video does not show that Mr. Castillanos dropped the gun or that the gun fell on the ground. The video shows that as Mr. Castillanos continues to turn toward the officers, he uses both hands to raise the gun and point it in the direction of the officer who had been walking on the neighboring lawn. The officers fire their weapons, and Mr. Castillanos falls to the ground.

The video shows Mr. Castillanos ignoring the officers' orders to drop the gun and to stop. The video shows that he stops walking away from the officers and turns toward them, using both arms to raise the gun in the direction of the officers. Mrs. Castillanos does not dispute that the video shows Mr. Castillanos raising the gun and pointing it toward an officer. (Docket Entry No. 14 at 2). The video does not show the officers "charging" Mr. Castillanos before the shooting, contradicting the allegations in the complaint. Given this video footage, which Mrs. Castillanos does not dispute, the allegations do not plausibly plead an unconstitutional use of deadly force. The Fifth Circuit "ha[s] never required officers to wait until a defendant turns towards them, with weapon in hand, before applying deadly force to ensure their safety." *Salazar-Limon v. City of Houston*, 826 F.3d 272, 279 n.6 (5th Cir. 2016); *see also Wilson v. City of Bastrop*, 26 F.4th 709, 714 (5th Cir. 2022) (the use of deadly force was not unconstitutional when the armed and fleeing suspect ignored the officer's command to drop his weapon, and onlookers were present). Even if there was such a threshold showing for an officer's legal use of deadly force, the video footage shows that it was met here. *Royal v. Spragins*, 575 F. App'x 300, 304 (5th Cir. 2014) (per curiam)

7

(use of deadly force not clearly excessive when suicidal man began to point gun at officers). The video footage shows that Mr. Castillanos disobeyed repeated police orders to drop his gun and instead was turning to face the officers, with his gun held in both hands and pointed toward an officer, when he was shot.

The Fourth Amendment claims against the officers are dismissed, with prejudice, because the record shows that it would be futile to amend to attempt to state a plausible claim for excessive force and to overcome the qualified immunity defense.

### B. The Eighth Amendment Claims

The individual defendants argue that Mr. Castillanos's Eighth Amendment claims must be dismissed because they can be brought only by persons who have been incarcerated following a criminal conviction. (Docket Entry No. 11 at 8). There are no allegations in the complaint that Mr. Castillanos was such a person. To the contrary, Mrs. Castillanos "would show *she does not allege* that her husband was a convicted prisoner." (Docket Entry No. 14 at 4) (emphasis added). "The protections of the Eighth Amendment against cruel and unusual punishment are limited in scope to convicted prisoners . . . ." *Morin v. Caire*, 77 F.3d 116, 120 (5th Cir. 1996). Because Mrs. Castillanos does not allege that Mr. Castillanos was a convicted prisoner at the time he was shot, the court dismisses the Eighth Amendment claims with prejudice because amendment would be futile.

### C. The Fourteenth Amendment Claims

Mrs. Castillanos brings Fourth and Eighth Amendment claims. She also appears to assert those same claims under the Fourteenth Amendment. (Docket Entry No. 1 ¶¶ 19–20). "Where a particular Amendment provides an explicit textual source of constitutional protection' against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process' must be the guide for analyzing these claims." *Albright v. Oliver*, 510

8

U.S. 266, 273 (1994). Mrs. Castillanos's claims are properly considered under the Fourth and Eighth Amendments, not the Fourteenth Amendment. Her Fourteenth Amendment claims are dismissed with prejudice because amendment would be futile.

## IV. The Claims Against the City of Houston for Failure to Train

Municipalities, such as the City of Houston, cannot be held vicariously liable for the conduct of their employees or directly liable on the basis of respondeat superior. *Burns v. City of Galveston*, 905 F.2d 100, 102 (5th Cir. 1990). Municipal liability under § 1983 "requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "The official policy itself must be unconstitutional or, if not, must have been adopted 'with deliberate indifference to the known or obvious fact that such constitutional violations would result.'" *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting reference omitted); *see also Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." (quoting *Monell*, 436 U.S. at 691))). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "A showing of simple or even heightened negligence will not suffice." *Id.* at 407. Instead, it "must amount to an intentional choice, not merely an unintentionally negligent oversight." *James*, 557 F.3d at 617–18 (quoting *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992)).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61. Official policy may be found in "written policy statements,

9

ordinances, or regulations, but it may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) (quoting reference omitted); *Piotrowski*, 237 F.3d at 581–82. "A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Jackson v. Valdez*, 852 F. App'x 129, 135 (5th Cir. 2021) (per curiam) (quoting reference omitted). "To plausibly plead a practice 'so persistent and widespread as to practically have the force of law,' a plaintiff must do more than describe the incident that gave rise to [her] injury." *Id.* (quoting *Peña v. City of Rio Grande*, 879 F.3d 613, 622 (5th Cir. 2018)).

> As the Fifth Circuit has summarized:
>
> [Fifth Circuit] caselaw establishes three ways of establishing a municipal policy for the purposes of *Monell* liability. First, a plaintiff can show "written policy statements, ordinances, or regulations." Second, a plaintiff can show "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." Third, even a single decision may constitute municipal policy in "rare circumstances" when the official or entity possessing "final policymaking authority" for an action "performs the specific act that forms the basis of the § 1983 claim."

*Webb v. Town of Saint Joseph*, 925 F.3d 209, 214–15 (5th Cir. 2019) (footnotes omitted) (quoting references omitted).

"To state a cognizable failure-to-train claim, a plaintiff must plead facts plausibly demonstrating that: (1) the municipality's training procedures were inadequate; (2) the municipality was deliberately indifferent in adopting its training policy; and (3) the inadequate training policy directly caused the constitutional violations in question." *Jackson*, 852 F. App'x at 135 (citing *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009)). "To proceed beyond the pleading stage, a complaint's 'description of a policy or

custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts.'" *Peña*, 879 F.3d at 622 (alteration in original) (quoting *Spiller v. Tex. City Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)). If actions of city employees are to be used to prove a custom for which the municipality is liable, a plaintiff must show

> "[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority;" or "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy."

*Jackson*, 852 F. App'x. at 135 (alteration in original) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)). Pointing to "isolated instances" does not establish a municipal custom. *Id.* (quoting reference omitted).

Mrs. Castillanos alleges that the City of Houston "failed to adequately train its officers on how to deal with individuals in mental crisis," on how to deescalate tense and difficult encounters, and on the "alternatives to the use of deadly force." (Docket Entry No. 1 ¶ 31). Mrs. Castillanos alleges that this lack of training "reflects deliberate indifference by the [City] and reckless and conscious disregard for the obvious risk that officers would use excessive or deadly force on mentally ill citizens and made the violations of Joe Castillanos' constitutional rights, including his death, a reasonable probability." (*Id.* ¶ 33). She states that the City also "failed to train its personnel adequately on the appropriate policies, practices, or procedures regarding the proper use of deadly force." (*Id.* ¶ 37).

Mrs. Castillanos alleges:

> The following conduct, policies, and customs . . . violated Joe Castillanos's constitutional rights:
>
> a.   the City of Houston and Houston Police Department's failure to adequately train, supervise, or discipline its officers who commit a wrongful act or attempt to cover up a wrongful act of a fellow officer;

11

>   b.   the City of Houston and Houston Police Department failed to maintain an adequate policy on the proper use of deadly force and alternatives thereto;
>
>   c.   the City of Houston and Houston Police Department's inadequate training on how to deal with individuals with mental illness or special needs;
>
>   d.   using deadly force against Joe Castillanos while he was walking away and threatening no one;
>
>   e.   maintaining a culture of police corruption that allowed police officers to feel that they can act without impunity through a pattern or practice of failing to adequately discipline and expurgate officers who violate policies and procedures.

(*Id.* ¶ 36). The City "failed to train its personnel adequately on the appropriate policies, practices, or procedures regarding the proper use of deadly force." (*Id.* ¶ 37).

These allegations do not identify specific City customs, policies, or practices that caused the alleged violations of Mr. Castillanos's constitutional rights, other than a general policy of inadequate training regarding the policies governing interactions with individuals in a mental health crisis and in the use of force in such interactions, and a general practice of not disciplining officers who use force in such interactions. The complaint does not allege facts showing an official policy that was the "moving force" behind the alleged violations of Mr. Castillanos's civil rights. *See Doe v. United States*, 831 F.3d 309, 318 (5th Cir. 2016) (quoting *Monell*, 436 U.S. at 690–95).

The only custom, policy, or practice that the complaint specifically identified was the following:

> Plaintiff would show that the Houston Police Department requires its officers to take a 40-hour course called Crisis Intervention Training or a similar type training. This particular training helps officers handle mental health crises, de-escalation techniques, and how best to interact with someone in a state of psychosis.

(Docket Entry No. 1 ¶ 28). The complaint does not allege that this policy was improper on its face or that it caused the alleged violations of Mr. Castillanos's rights. Rather, the complaint allegations are that the individual officers disregarded the official policy and failed to follow it. These

12

allegations of an "isolated incident[]" are an insufficient basis for municipal liability. *Jackson*, 852 F. App'x at 135.

The City asks the court to consider its official written policy on the use of force and the use of deadly force. (Docket Entry No. 11 at 17–18) (providing excerpts of the Houston Police Department's Response to Resistance Policy, Gen. Ord. 600-17). In relevant part, the written policy authorizes "officers to use force to protect themselves or others" and instructs that, "[w]hen dealing with members of the community, . . . [officers] must use only the amount *of objectively reasonable* force necessary to successfully protect themselves or others, to effect and arrest, or to bring an incident under control, even if under the circumstances the law would allow the use of greater force." (*Id*. at 17). The general order requires officers to consider whether there is an "immediate threat to the safety of the officer or others." (*Id*.). The policy also requires that "[w]henever practical, officers shall use *de-escalation techniques* to gain voluntary compliance and to seek to avoid or minimize the use of physical force. When safe and feasible, officers shall attempt to slow down or stabilize the situation so that more time, options, and resources are available." (*Id*.).

The policy continues with a section specifically addressing "use of deadly force." (*Id*.). This part of the written policy emphasizes that deadly force is "limited to those circumstances in which an officer has an *objectively reasonable* belief deadly force is necessary to protect themselves or others from the imminent threat of serious bodily injury or death. Officers shall exhaust all reasonably available alternatives . . . ." (*Id*.).

The written policy also specifically addresses de-escalation, requiring officers to use de-escalation techniques "when safe and reasonable." (*Id*.). The policy requires, "whenever possible," that at least two officers and a field supervisor respond to

> scenes involving individuals exhibiting violent or irrational behavior, extreme agitation and/or brandishing a weapon. In all high-risk situations, if time and other circumstances allow, the responding supervisor and officers shall assess the scene and develop a plan for approach. In cases of imminent danger, responding officers should not delay the approach to wait for backup unit(s) or a supervisor.

(*Id.* at 18).

Mrs. Castillanos does not allege that the written policy is unconstitutional. She relies on her allegations that the City is liable for failing to adequately train the officers in the City's written policy on responding to calls based on a need for a mental-health crisis intervention. There are no plausible factual allegations as the quality or effectiveness of the crisis-intervention training, and no plausible factual allegations as to the causal relationship between the training and the police shooting of Mr. Castillanos. The allegations do not plausibly allege a claim against the City for failing to train its officers in responding to such a call. *Jackson*, 852 F. App'x at 135.

Mrs. Castillanos alleges that the City's inadequate training is shown by the fact that officers shot her husband as he was "walking away and threatening no one." (Docket Entry No. 1 ¶ 36). But the video footage she cites and relies on shows that the officers shot after Mr. Castillanos had not only refused orders to let go of and throw down the gun, but walked away from the officers, fired his gun into the ground, then turned to face the officers and raised his gun using both hands and pointed the gun toward one of the officers. The video shows no use of force until the officers had an objectively reasonable basis to believe that Mr. Castillanos posed an immediate threat to their safety. *Cf. Graham v. Connor*, 490 U.S. 386 (1989); *Cloud v. Stone*, 993 F.3d 379 (5th Cir. 2021).

Mrs. Castillanos identifies no other incidents involving the officers she has sued. She makes only the conclusory assertion that, "prior to May 25, 2020, the Houston Police Department knew or should have known that Defendants Nahuel Faiura, Todd failure Henson and M. Macuga exhibited a pattern of escalating encounters with the public." (Docket Entry No. 1 ¶ 26). An

14


isolated incident by an individual officer usually cannot support a finding of municipal liability for those acts. *See Hutcheson v. Dallas County*, 994 F.3d 477, 483 (5th Cir. 2021) (the plaintiffs' allegation that "[t]he fact that [an] incident occurred *at all* demonstrates the obvious need for Dallas County to provide its officers with additional or different training" was conclusory (first alteration in original)); *Anokwuru v. City of Houston*, 990 F.3d 956, 965–66 (5th Cir. 2021) (same). There are no allegations of prior deadly force incidents involving these officers, as necessary to put the City on notice that they were likely to violate the civil rights of individuals they encountered.

Mrs. Castillanos also argues that she can show an official custom or practice of unconstitutionally excessive police force by arguing that, in the 34 days "surrounding" Mr. Castillanos's death, five other individuals were shot and killed by police and two more were shot but not killed. (Docket Entry No. 14 at 8–9). She does not allege whether, or how, these incidents related to the incident at issue here. She simply argues that the other incidents show that the "Houston Police were in a killing mood at the time when Joe Castillanos was killed." (Docket Entry No. 14 at 9). To allege a pervasive pattern of sufficiently similar prior events that shows a widespread practice or custom or a municipality's notice of an unconstitutional custom or practice and deliberate indifference to the risks of constitutional violations, a plaintiff must allege facts showing a significant number of similar prior incidents, considering the size of the law enforcement agency and the city it serves. *See, e.g.*, *Peterson*, 588 F.3d at 851 (holding that 27 complaints of excessive force over three years in a 1,500 person police force was not a pattern); *Hicks-Fields v. Harris County*, 860 F.3d 803, 810 (5th Cir. 2017) (showing an unconstitutional pattern or practice of which the municipality had notice requires allegations as to whether and how the other incidents were similar to the incident at issue).

Mrs. Castillanos also argues that the City can be held liable because it failed to discipline the individual defendants or other officers who used deadly force. Putting aside the absence of plausible allegations of the officers' unconstitutional use of deadly force, the broad allegation of a general practice of not disciplining officers using deadly force is not enough to avoid dismissal. Like a claim for failure to train, a claim for failure to discipline requires the plaintiff to show that, in failing to discipline its employees, a municipality acted with deliberate indifference. *Deville v. Marcantel*, 567 F.3d 156, 171 (5th Cir. 2009) (citing *Piotrowski*, 237 F.3d at 581)). As with her claim for failure to train, Mrs. Castillanos does not make factual allegations that would establish deliberate indifference. *Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019) ("[O]nly very similar violations could jointly form a pattern." (citing *Connick*, 563 U.S. at 62); *Ololade v. City of Houston*, No. 4:20-cv-04040, 2022 WL 980275, at *3 (S.D. Tex. Mar. 31, 2022) (dismissing a failure to discipline claim when there were no allegations that the "Chief of Police was deliberately indifferent 'to the known or obvious consequences that constitutional violations would result' from [the] failure" to discipline (quoting reference omitted)).

In opposition, Mrs. Castillanos states that the police failed to aid Mr. Castillanos after shooting him. (Docket Entry No. 14 at 3). This allegation would be made in support of a claim under the Fifth Amendment's Due Process Clause. *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 279 (5th Cir. 2015). Such a claim is not pleaded in the complaint.

At this time, Mrs. Castillanos fails to state a claim against the City. Her claims against the City are dismissed with prejudice with respect to the alleged Fourth Amendment violations by the responding officers. Nevertheless, Mrs. Castillanos has not previously amended her complaint, and the court will grant leave to file an amended complaint should she wish to plead her Fifth

Amendment claims regarding her statements that officers failed to aid Mr. Castillanos after shooting him.

## V.     All Defendants—Intentional Infliction of Emotional Distress

Mrs. Castillanos brings claims for intentional infliction of emotional distress against all the defendants for the harm she and her children suffered when they witnessed the shooting of her husband. (Docket Entry No. 1 ¶¶ 39–43). The defendants argue that Texas statutes preclude liability for this kind of tort claim. (Docket Entry No. 11 at 9–10).

The Texas Tort Claims Act provides a limited waiver of sovereign immunity with respect to certain tort claims against the state and its subdivisions. *See* TEX. CIV. PRAC. & REM. CODE § 101.001 *et seq*. This waiver does not apply to claims "arising out of assault, battery, false imprisonment, or any other intentional tort." *Id.* § 101.057(2). Intentional infliction of emotional distress is an intentional tort for which Texas has not waived sovereign immunity. *Id.* § 101.057 (waiver of sovereign immunity does not apply to intentional torts); *see also Travis v. City of Grand Prairie*, 654 F. App'x 161, 167 (5th Cir. 2016); *Nueces County v. Ferguson*, 97 S.W.3d 205, 223 (Tex. App.—Corpus Christi 2002, no pet.). Because the municipal defendants have not waived their sovereign immunity with respect to Mrs. Castillanos's intentional tort claims, those claims are dismissed with prejudice.

The state-law claims against the officer defendants must also be dismissed under the election-of-remedies provision of the Texas Civil Practice and Remedies Code § 101.106(e). If a plaintiff sues both a Texas governmental entity and its employees and the governmental entity moves to dismiss, the complaint must be dismissed against its employees. *Bustos v. Martini Club Inc.*, 599 F.3d 458, 463 (5th Cir. 2010) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 658–59 (Tex. 2008)). Castillanos has sued both the City of Houston and certain of

its officer employees. The court grants the motion to dismiss the state-law claims against the officer defendants, with prejudice, because amendment would be futile.

## VI. Conclusion

The motions to dismiss, (Docket Entry Nos. 11, 15, 17), are granted.

The complaint allegations fail to state a plausible cause of action. The court dismisses, with prejudice, the Fourth, Eighth, and Fourteenth Amendment claims against the individual officer defendants and the related failure-to-train claims against the City of Houston. The court dismisses, with prejudice, the state-law claims against the individual officer defendants and the City of Houston. Amendment as to these claims would be futile. The court also dismisses all claims against the Houston Police Department,

Mrs. Castillanos's claims regarding the officers' failure to render aid to Mr. Castillanos after the shooting are dismissed without prejudice. Any amended complaint must be filed no later than November 7, 2022.

SIGNED on October 11, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge